(C. D. 618)

Schering Corp. *v.* United States

United States Customs Court, First Division

(Decided April 22, 1942)

*Eugene R. Pickrell* for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney), for the defendant.

Before Oliver, Walker, and Tilson, Judges

Tilson, Judge: This suit against the United States was brought at the port of New York to recover certain customs duties claimed to have been illegally exacted upon an importation of merchandise invoiced and entered as "protein derived from mare serum," which was classified by the collector as a medicinal preparation under paragraph 5 of the act of 1930, and assessed with duty at the rate of 25 percentum ad valorem.

The plaintiff claims the merchandise to be properly dutiable at various lower rates under different paragraphs, or free of duty under

paragraph 1669. While not abandoning any of its claims, it appears to rely principally upon the claim for free entry under paragraph 1669, or that the merchandise is properly dutiable at 12 cents per pound under paragraph 701.

The pertinent parts of the competing paragraphs are as follows:

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

PAR. 1669. * * * and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph.

PAR. 701. * * * dried blood albumen, light, 12 cents per pound; dark, 6 cents per pound.

At the trial of the case counsel for the plaintiff offered the testimony of four witnesses in support of its claims. The defendant offered no direct testimony.

The first witness testified that in 1939 he was employed by Quimica Schering, A. G. in Buenos Aires, Argentina; that this concern imports chemicals and pharmaceuticals into the Argentine, and that he was treasurer of the concern, having charge of the bookkeeping and statistics; that the concern did not produce pharmaceuticals, nor did it produce the blood of pregnant mares; that the concern purchases such blood from the Laboratorio Quimico Biologico, Buenos Aires, where he saw the protein from mares' serum produced; that twice, in July and August, 1939, he saw the blood withdrawn from pregnant mares on the farm of Maria Isabel; that this is done by means of a pump; that after the blood has been withdrawn from the mares' veins, sodium citrate is added; that he saw the blood brought to the Laboratorio Quimico Biologico, where by means of a centrifuge the serum was separated from the blood corpuscles.

He further testified that while the imported merchandise was not the same serum he saw produced, it was the same sort of merchandise, and that other than seeing it produced, he had had no experience with the imported merchandise.

It appears from the record that the second witness who testified for the plaintiff studied chemistry at the University of Berlin, Germany, from 1930 to 1934 and that he was graduated from the Technical High School at Danzig in 1936 with the degree of Doctor of Technical Science, after which he spent about 6 months doing private studying on patent materials, gonadotropic hormones, and thereafter came to

the United States in November, 1937, where he was employed by the plaintiff herein and has been in their employ to the present time, doing research work and supervising the production of the gonado-tropic hormone derived from serum.

Upon being shown the consular invoice in this case, the witness stated that he was familiar with the merchandise; that he had received the material from the Schering Corporation on July 18, 1939; that under his supervision a man working for him drew a sample, a 5-gram sample from that importation. The witness produced the sample and the same was admitted in evidence as exhibit 1. He then stated that shortly after receiving the merchandise he sent a sample thereof to Dr. Putter, asking him to test it for hormone activity, and that after he received Dr. Putter's report he extracted the hormone by the following process: He made an alkaline extraction, stirred that for about 8 hours, added a solution of sodium acetate and chloroform in the amount of half the volume of the extraction and as much acetic acid as is necessary to obtain a pH of approximately 4. This mixture he stirred for 1 hour and then centrifuged it, thereby obtaining a supernatant water layer which he precipitated with two volumes of alcohol. The residue in the centrifuge cup he reextracted in a similar manner in order to obtain a better yield. He kept both precipitations in the ice box overnight and the next morning syphoned off and discarded the clear supernatant liquid. The residue he dried in acetone and alcohol and collected it on a filter. This product he further purified by dissolving in water and crystallizing out the greater part of the sodium sulphate at a temperature near the freezing point. The remainder of the salt he removed by dialysis using a cellophane membrane. He precipitated the product from the remaining solution with a large quantity of alcohol and further purified this precipitate by two or three similar procedures in which he dissolved the hormone in water, precipitated the impurities out at an alcohol concentration of 60 per centum, and then precipitated the active constituent at a concentration of at least 65 per centum.

This purified product he delivered to Dr. Putter, asking him to make a biological test for hormone activity and also for toxicity. He also testified that if the two tests are satisfactory he just delivers the product to Dr. Putter; that he had made a qualitative analysis of a sample of exhibit 1 making qualitative determinations of carbon, hydrogen, nitrogen, sulphur, and some general tests for proteins and albumens; that these general tests were the Biuret reaction, the Millon reaction, the Adamkiewicz test and the Xantho protein test; that as a result of these analyses he could say that this product was of a protein nature, in general terms, of an albumen nature; that he

had compared the behavior of dried blood albumen with exhibit 1 and found their behavior to be similar in this same procedure; and that he found no alcohol in exhibit 1.

The witness testified that the merchandise as imported is toxic since it is derived from horse serum and every animal contains proteins which are peculiar to its type so that injections of a horse protein into a human being would sensitize the human being against this protein, and if the same product were reinjected for the second time, the human being would receive a severe shock and probably die from it; that accordingly in the purification process it is necessary to remove all proteins or albumens which are typical for a horse; that he had specialized in biological chemistry and had learned the foregoing from his studies and from the practice of his profession, although he is not a physician; that the purified hormone extracted from this source is sold by Schering Corporation under the trade name of Anteron; that the chemical or biological name for this hormone is gonadotropic hormone from pregnant mares' serum; that this differs from the hormone derived from pregnant mare's urine which is excreted by the gonads, and is used for a different purpose; that the hormones which can be extracted from the urine is a sex hormone, but the hormone from exhibit 1 is not a sex hormone, and is used to ease a woman's symptoms when she has her menopause and stimulates the gonads to produce a certain kind of hormone.

The next witness had studied medicine in the Universities of Griefswald, Munich, Berlin, and Koenigsberg, Germany, and at the University of Berne, Switzerland, from 1910 to 1916 and received the degree of doctor of medicine from the first-named institution in 1916; he is a physician, licensed in Germany in 1916; during the next two years he was a physician in the war; from 1919 to 1923 he was engaged in research work and for a time in teaching bacteriology at the University of Greifswald and in doing bacteriological work for the State Department of Hygiene in Munich, after which he went with the Schering Corporation in Berlin, and until 1938 he was director of its bacteriological department; he then came to the Schering Corporation in Bloomfield, N. J., where he is director of the biological laboratory, engaged in research work and experiments on the activity of hormones; he had experience in research and in the manufacture of vaccines and serums in the factory in Germany for about 15 years, and had had similar experience with hormones, including the production of several; his experience in testing hormone activity was in the United States and not in Germany.

This witness testified that on July 8, 1938, he received a sample of the imported merchandise with a request that he determine the hor-

mone activity of the same; that he had determined this activity by injecting different amounts of a solution of the imported material into four groups of five female rats, 3 weeks old, killing the animals 96 hours after the first injection and then removing the ovaries and uterus and examining the vagina; that as a result of this experiment he determined the hormone activity of exhibit 1 to be between 30 and 40 rat units per gram, 1 rat unit being the amount of material which is thus able to increase the weight of an infantile rat 5 times; that one rat unit corresponds to 15 international units, a unit established by the League of Nations in Switzerland; that he had made a toxicity test upon exhibit 1, using guinea pigs sensitized by an injection of horse serum; that this test was made by injecting 10 milligrams of exhibit 1 into the guinea pigs 2 or 3 weeks after they were sensitized, whereupon they had an anaphylactic shock and died in 15 to 17 minutes, proving that exhibit 1 contained horse albumen; that he had determined the hormone activity of the merchandise after treatment by Dr. Fleischer, and by the same test as before found the activity to be increased about two thousand times to nearly sixty thousand rat units per gram.

The witness further testified that after he sterilized this product, by a further test on rats he found the hormone activity to be unchanged by the sterilizing process; that he had found this product, by the same test on guinea pigs, to be nontoxic; that he had then prepared this gonadotropic hormone in pellets, placed in sealed ampules, which were sold to the trade under the name of Anteron.

A sample of these pellets was received in evidence as exhibit 2, as representing the hormone obtained from exhibit 1, as extracted and marketed by the plaintiff herein. The witness stated that based upon his experience and the tests made, it would be extremely dangerous to administer exhibit 1 to human beings without purification because of its foreign albumen content, and that it would also be inadvisable to use it upon animals because it would cause the same reaction as on the human being; that exhibit 2 is administered by injecting a solution of the tablets intravenously, intramuscularly, or subcutaneously; that he has administered this product which is used to stimulate the sex organs of both men and women; that exhibit 1 contains approximately one-hundredth of 1 per centum of hormone, the remainder being albumen, and that exhibit 1 may be a dried serum.

On cross-examination the witness testified that he had made the serum from the blood of pregnant mares but not in the form of exhibit 1; that in his opinion the extraction of the blood from the mare was one step in the advancement of the product; that the

separation of the red corpuscles from the serum was another step, and that the drying of the serum is still another step; and that this is the condition in which the merchandise is imported. The witness also testified that when he prepared the serum for use there were six ampules, three containing the pellets and three containing a dilutent, which is distilled water; that when the doctor administers this Anteron he opens one of the ampules of the dilutent and one of the pellets so as to bring the solution of distilled water into the pellet of Anteron and this solution he injects into the patient by means of a syringe, and that exhibit 1 was not edible.

The fourth witness, after being properly and thoroughly qualified, testified that he had been with the plaintiff herein since 1933, as director of research and chief chemist and also vice president of the corporation; that he has been granted several United States patents on hormones and has others pending, one of which covers the hormone in exhibit 1; that he issued instructions for the extraction of the hormone contained in exhibit 1, its preparation and shipment to the United States; that those instructions were as testified to by a previous witness; that the separation of the blood corpuscles and the acidification of the resulting plasma or serum containing the hormone by the addition of sulphuric acid are all for the purpose of preventing the deterioration of the hormone; and that in the form of exhibit 1 is the only practical form in which to transport the product without decomposition.

The foregoing testimony establishes that the imported merchandise was originally the blood of pregnant mares to which, after extraction, is added sodium citrate for preservative purposes, from which the red corpuscles are then separated, leaving a plasma or serum containing the hormone; that this is then acidified with sulphuric acid also to prevent decomposition, and in this form the merchandise is packed and imported by the plaintiff; that as imported the merchandise is composed of approximately one-hundredth of 1 per centum of hormone and the remainder is blood albumen; that after importation the hormone is extracted, tested for activity and toxicity on rats and guinea pigs, purified, dried, reduced to a powder, formed into pellets, and put into ampules and thus sold to the trade as Anteron for the purpose of being injected into human beings, both men and women, to stimulate the sexual organs, and into women to ease the symptons at the time of menopause. The merchandise at bar is inedible.

The evidence shows that the imported merchandise is not a medicinal preparation, as classified by the collector, as that term was defined in *United States* v. *Merck*, 66 Fed. 251. It is not used in the form in which imported by the physician. The manufacturer extracts from the imported merchandise its vital principle, which is known as hormone. The imported merchandise is not a medicinal prepara-

tion. It is an article from which a medicinal preparation can be, and is, made.

It is not reasonable to conclude that the Congress in the enactment of paragraph 1669, covering drugs, intended to cover and include therein an article such as that in this case composed of only one-hundredth of 1 per centum of a material which might be considered as a drug, when the remainder of such article, $99\frac{99}{100}$ per centum, was composed of blood albumen, which latter component can scarcely be considered as a drug of any kind. It is therefore clear to us that the merchandise cannot be properly classified under said paragraph 1669 as a drug of any kind.

An examination of the sample before us shows the same to be light in color.

On the record presented, and for the reasons stated, we hold the merchandise designated on the invoice as "Protein derived from mare serum" to be properly dutiable at 12 cents per pound under the provisions for the same in paragraph 701 of the act of 1930, as claimed by the plaintiff.

To the extent indicated the specified claim in this suit is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.